UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 06-227-02(RBW) |
| v. | : | |
| TROY ANTOINE HOPKINS, | : | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby requests that this Court deny the defendant's Motion to Suppress Statements. In support of this request, the government submits the following points and authorities:

I.   THE STATEMENTS

   A.   Statement Via Telephone at Time of Search Warrant.

The defendant, Troy Hopkins (hereinafter "Hopkins"), and his various co-defendants, were Indicted by a Grand Jury for the United States District Court for the District of Columbia for Conspiracy to Distribute and Possess with Intent to Distribute Phencyclidine (hereinafter "PCP"), in violation of 21 U.S.C.§ 846.[1] As part of a nationwide take-down, the Hopkins' family home in Lanham, Maryland was searched on August 1, 2006. After his home was searched on August 1, 2006, Hopkins spoke to Special Agent Jesus Gomez by telephone and discussed his warrant. The phone was passed between Agent Gomez and Alfred Hopkins, Hopkins' father,

---

[1] The government hereby incorporates by reference all of the facts submitted in its two previous omnibus motions.

who urged Hopkins to surrender in Agent Gomez' presence.[2]  Agent Gomez advised Hopkins that he was wanted for Conspiracy to Distribute more than a kilogram of PCP.   Hopkins claimed that he would turn himself in within days of that conversation.  Instead, however, he elected to flee the jurisdiction, requiring government agents to engage in a nearly year-long, nationwide manhunt for the defendant.

      B.     Statement Following Arrest on May 17, 2007.

At approximately 7:30 a.m. on May 17, 2007, after a lengthy and costly search for Troy Hopkins (hereinafter "Hopkins" or "the defendant"), the U.S. Marshal's Service managed to find Hopkins in the Commerce Casino, a large gaming casino located in the City of Commerce, a small municipality in the County of Los Angeles, California.  Security tape captured the arrest of Hopkins.  At the time of the arrest, Hopkins had entered a glass booth on the gaming floor.  The booth functioned as a smoking lounge and was filled with people.  Hopkins was seated so that he was facing out of the booth's glass entry door.  Hopkins, who has some sort of sleeping disorder, appeared to fall asleep between 6:00 a.m. and 7:30 a.m..  After entering the casino on a tip from casino security, the deputies espied Hopkins and moved in to arrest him.  Hopkins raised his arms and was taken into custody without any obvious resistance from Hopkins.

The leader of the group of marshals looking for Hopkins was Deputy Adrian Rolfe (hereinafter "Rolfe").  Rolfe handcuffed Hopkins and led him through the parking lot to a waiting Marshals' transport vehicle.[3]  Without any questioning from Rolfe or any other member of law

---

[2]    Alfred Hopkins identified his son to Agent Gomez and Hopkins' identified himself to Agent Gomez.  At no time during the conversation did Hopkins deny his identity.

[3]    Security video cameras also captured Hopkins being led to the awaiting car.

enforcement, Hopkins began talking. Indeed it was Hopkins who engaged in questioning of Rolfe. Hopkins asked Rolfe how Rolfe had found him. Rolfe replied that he could not tell Hopkins how he found him. Hopkins then repeated his question, and Rolfe did not reply. Hopkins then asked Rolfe if there was anything he could do to avoid going to jail. Rolfe chuckled, aware of the fact that the search for Hopkins had been long and frustrating. Again Rolfe did not reply. Hopkins asked Rolfe where he was being taken. Hopkins stated that he did not want to go to the Twin Towers, a local nickname for the Central Los Angeles Jail located on Beauchet Street in Los Angeles (though the Metropolitan Detention Center on Spring Street houses Federal inmates). Hopkins told Rolfe that he could give him the name of the biggest distributor of PCP in Los Angeles. Rolfe replied that unless Hopkins knew where Osama bin Laden could be found in that moment, he was going to jail.

    Hopkins continued to protest going to jail in Los Angeles, explaining that west coast people were crazy and that he was not affiliated with a criminal street gang from the west coast. Rolfe, who has considerable experience in the Los Angeles area, understood that many defendants believe there is an east coast - west coast rivalry that can result in conflict in jail. Further Rolfe understood Hopkins to be expressing concern for his personal safely in jail since he was neither a Crip nor a Blood.

    As Rolfe continued to drive toward the Metropolitan Detention Center, Hopkins continued to speculate aloud, and not in response to any questioning, about how Rolfe had finally located him. Hopkins talked about an apartment in Paramount, California, where Rolfe had gone to arrest Hopkins. Rolfe had espied Hopkins over the security camera as he and a woman named Oba Faroq entered the subterranean parking garage of the building several months earlier. By the

time Rolfe got to the garage, Faroq was alone, and Hopkins was gone. Hopkins, acknowledging that he had resided in the Paramount apartment, opined aloud that Rolfe must have found a poker chip in his pocket, and that must have led Rolfe to the Commerce Casino, suggesting that Hopkins had left clothing behind at the apartment in Paramount.

At this point Rolfe asked a question. He asked Hopkins why he was at a casino at six in the morning. Hopkins replied, "Because I knew you were looking for me." Rolfe then stated to Hopkins that he had looked for Hopkins at a Native American gaming casino in Temecula, a town northeast of San Diego. Hopkins said that he had stopped going to the casino in Temecula because he was "up" a the gambling table and the casino wanted him to fill out a tax declaration form. Hopkins said that he refused to do so and that casino security officers barred him from returning. Hopkins added that he had been "up" $40,000 to $50,000. Hopkins then asked Rolfe how Rolfe had known he was in the casino in Temecula. Rolfe did not reply.

As Rolfe's car neared downtown Los Angeles, the area of both of the jails, Hopkins repeated that he was concerned about his safety in the jail, and he inquired about where he would be housed in the jail. Rolfe did not provide any response. He then arrived at the Metropolitan Detention Center, the federal jail, and began routine booking procedure and questions.

At the time of his arrest, Hopkins was wearing a Chicago White Sox hat, and Rolfe realized to himself that he had seen such a hat in the apartment in Paramount. From Hopkins' pocket, Rolfe removed a cell phone and a cell phone charger, a poker chip, and a pack of Newport cigarettes. Rolfe then left Hopkins in the custody of the U.S. Marshals who ran the Metropolitan Detention Center and the two men spoke no further.

II.  THE DEFENDANT'S STATEMENTS WERE NOT THE PRODUCT OF INTERROGATION AND SHOULD BE ADMITTED AT TRIAL.

Because Hopkins was not questioned by Rolfe, his statement were not the product of interrogation and do not violate the tenants of Miranda v. Arizona 384 U.S. 436, 86 S.Ct. 1602, 1627 (1966).  Neither were the defendant's statements elicited through the functional equivalent of questioning, as was forbidden by holding in Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 1690 (1980).[4]  Instead, Hopkins was curious about how he had been caught and posed questions to the deputy in order to figure out how they had been able to locate him in the smoking lounge of a casino early in the morning.  Indeed, Hopkins is the one who questioned the deputy, and not the other way around.  Further, Hopkins had a motivation to ask questions of the deputy and to supply the deputy with information.  That motivation was fear.  Hopkins appears to have been anxious about where he would be housed pending his extradition since he clearly feared going to the Los Angeles County Jail and told the deputy about his belief in an east coast - west coast rivalry and his lack of affiliation with the Crips and the Bloods.

Finally, Hopkins did make a statement in response to a statement by Rolfe, and one statement in response to a question posed to him by Rolfe.  The government acknowledges that Rolfe's statement that he had gone looking for Hopkins in the casino in Temecula could be interpreted as inviting a response from Hopkins.  Again, the government submits that Hopkins was a criminal sophisticate with a long history of dealing with the police and the judicial system.  Hopkins was not forced to reply to Rolfe's statement, and Hopkins surely knew that any

---

[4] In viewing the statement by Hopkins, it is important to note that Hopkins sustained over seven prior arrests and was presumably aware of his right to remain silent, having pleaded guilty six previous times with the assistance of counsel.

5

statement he made would be used against him. Further, Rolfe did not request a response from Hopkins at that time and any statement made by Hopkins in reaction to Rolfe's statement should be admissible none-the-less. In response to a direct question about why he was gambling at six in the morning, posed prior to advisement of rights and while he was in custody, Hopkins explained his presence at the casino by saying that he knew he was wanted. This appears to the government to be the only statement made in response to questioning. To simplify matters, the government will not inquire about this ultimate statement since ample other evidence proves the defendant's state of mind on that score.

WHEREFORE the government requests that the defendant's motion to suppress statement be denied.

Respectfully submitted,
JEFFREY TAYLOR
United States Attorney
Bar No. 498-610

_____

S. Elisa Poteat
Assistant United States Attorney
555 4th Street, N.W.
Washington, DC 20001
Bar. No. 420-604

CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that I caused a copy of the foregoing to be served upon the attorney for the defendants below on September 23, 2007.

                                                                               _____
                                                          S. Elisa Poteat
                                                          Assistant United States Attorney

Defense Counsel:

1)     Mr. Howard Bernard Katzoff, Esq.
        Counsel for Defendant Lawrence Bryant
        katzoffh@aol.com

2)     Mr. James W. Rudasill, Jr., Esq.
        Counsel for Defendant John Downs
        rudasilljr7@aol.com

3)     Mr. Nathan Silver, Esq.
        Counsel for Defendant Darnell Jackson
        nisquire@aol.com

4)     Mr. Rudy Acree, Esq.
        Counsel for Defendant Bernie Hargrove
        Faxed to 202-331-7004

5)     Mr. Jensen Barber, Esq.
        Counsel for Defendant Keith Roots
        jebarber@aol.com

6)     Mr. Gary Sidell, Esq.
        Counsel for Defendant Lanika Mercedes Franklin
        suitcase@verizon.com

7)     Mr. Harry Tun
        Counsel for Defendant Troy Chavious
        Tunharry@aol.com

8)     Mr. Cary Clennon
        Attorney for Defendant Troy Hopkins
        Clennon_law@comcast.net

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 06-227** |
| | : | |
| v. | : | |
| | : | |
| **TROY ANTOINE HOPKINS** | : | |

## ORDER

Having reviewed the defendant's motion to suppress statements and the government's response thereto, the defendant's motion to suppress statement is hereby,

DENIED, this the ___ day of _____, 2007.

_____
REGGIE B. WALTON, JUDGE
UNITED STATES DISTRICT COURT
 FOR THE DISTRICT OF COLUMBIA