## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 06-227-02(RBW) |
| | : | |
| v. | : | |
| | : | |
| TROY ANTOINE HOPKINS, | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby provides the following information to this Court of facts relevant to the defendant's sentencing:

I.     HISTORY OF THE CASE

This investigation began in 2004 as a result of a random wiretap call in an unrelated case investigated by Special Agents Timothy Ervin and Tucker Vanderbunt of the Federal Bureau of Investigation (FBI). As a result of that earlier case, agents learned that Darnell Anthony Jackson was a major seller of Phencyclidine (PCP). Focusing on Jackson, agents used cooperating defendants and sources to buy from and record him, building their case and identifying his various co-conspirators. As the investigation progressed, however, they learned that much of what Jackson received came from Troy Hopkins. Later agents learned that Hopkins was a far more prolific dealer than Jackson, and that he had access to much more PCP than Jackson did.

Hopkins had been investigated by the Prince George's County Police and the Drug Enforcement Administration (DEA) for several years. Their investigation revealed, and evidence adduced at trial confirmed, that Hopkins started the instant conspiracy, possibly as early as 1999. Hopkins had sold cocaine earlier in a large quantities as well, possibly beginning as early as when he was in a private high school in Maryland.

Flight records show that many people acted as couriers for Hopkins, and the testimony of the couriers revealed that far more couriers were recruited into the conspiracy than were ever indicted. The numbers of flights taken by these couriers and Hopkins himself well-exceeded 30 flights. At trial, literally reams of flight records were introduced through records custodians from Southwest and JetBlue Airlines. All of the couriers who testified at trial revealed that they were expected to carry approximately a gallon of PCP on each trip to Washington. If on each flight approximately a gallon of PCP was transported by each courier, the amount far surpasses the highest amount anticipated in U.S.S.G. §2D1.1(c)(1), that is 30 kilograms. This would be true even if one assumed that each courier carried a half a gallon on each trip. Therefore, the defendant's base offense level, not considering his drug priors which make a life offense mandatory in this case, should be a level 38. However, see below that Hopkins should actually receive a life offense.

In 2003, Hopkins' methods became obvious to law enforcement when a group of his couriers and partners were captured in Los Angeles. The facts about the arrests and seizures in Los Angeles were clearly presented at trial through numerous witnesses and they show the genesis of the instant conspiracy and Hopkins' authorship of its methods. The facts of this 2003 case are fully outlined later in this memorandum.

After the 2003 incident in Los Angeles, Hopkins altered his methods, traveling from Long Beach Airport, and switching to a different discount airlines, JetBlue (and others). He continued to use couriers and to pay them very little for transporting the substance aboard planes. He developed different suppliers as his needs changed, and he never slowed his efforts or reconsidered his life-path. Instead, over the years, he drew more and more people into the conspiracy and promised them fast and easy money if they would act as couriers, invest, or sell drugs for him. At trial, it became

clear that he eventually partnered with Scott Wages ("S-Dot") and with Darnell Anthony Jackson.

In wiretap calls, Hopkins was self-assured as he listened to Jackson plead for some PCP. Hopkins warned Jackson to stop adding starter fluid to dilute the drugs, saying that to adulterate his drugs would diminish his reputation as a drug dealer. He rapped poetically, as if he were just a fun-loving guy, and not a career drug offender, showing his cavalier attitude.

Hopkins' methods to hide the conspiracy were not unsophisticated. Instead, they were very extensive and complex and involved many people. According to U.S.S.G. §3B1.1, cmt.n.4, Hopkins' base offense level should be increased by four points for his leadership role since he exercised decision-making authority, recruited many accomplices, claimed a larger share of the profits, and used a high degree of planning. Hopkins' methods included the deliberate use of false identities, pre-paid credit cards, wire remitter services like Western Union and Traveler's Moneygram, money couriers and other techniques. (Information obtained before trial strongly suggested that he also laundered money through a real estate scheme that soured when one of the conspirators lost money in an investment.) He developed a system to distance himself from the drug couriers, placing them at hotels, having them buy their own airline tickets with prepaid credit cards, sending underlings to pick up the PCP from them, taking different flights, or not flying at all when they were flying, and hiding them for days after the seizure at Dulles Airport. The evidence at trial revealed a conspiracy that had well in excess of five conspirators. Finally, Hopkins consistently claimed a far greater amount of the proceeds than almost anyone else, including his own nephew. He paid couriers as little at $1,000 per trip while he resold PCP gallons for over $20,000. He paid his nephew in champagne and dinners. Unequivocally, he cast himself as a leader.

Hopkins committed a number of acts of obstruction and planning that should result in an increase in his sentence. On May 24, 2006, Tinesha Adams and Lanika Franklin were detained at Dulles and the two gallons of PCP they were carrying was seized. They immediately contacted Hopkins. He instructed them to go to the hotel and then switch rooms to avoid detection. He then spirited them to a friend's apartment where they hid for days. In banter on the wiretap, Hopkins cautioned Jackson about talking on the phone because he suspected it was tapped. Later conversations suggest that Hopkins tried to use his father's law-enforcement know-how to learn exactly what has happened to the couriers at the airport since he doubted their version of events.

This seizure of PCP by agents at Dulles Airport did nothing to change Hopkins' attitude. Receipts recovered at his home show the operation to transport PCP continued in the wake of the seizure. According to the testimony at trial and other corroborative evidence, persisted in trafficking PCP, holing up in hotel rooms in California for weeks at a time while couriers ferried the drugs to the east coast.

After the case was indicted by a grand jury, Hopkins' family's home was searched in suburban Maryland and a large amount of documentary and physical evidence was recovered, including a money counting machine that Troy Chavious testified Hopkins used to count his illicit drug proceeds, seven firearms, and approximately $14,000 cash. Videotape shown at trial featured Hopkins meeting with his co-conspirators and calling out a posse to defend the family home when he feared he was being watched or was about to be robbed of its drug proceeds.

Under U.S.S.G §3C1.1, app.n.4(e). Hopkins should receive an increase of two levels in his base offense for obstructing justice. After the search warrant was executed on Hopkins' parents' home in Maryland, he spoke to Special Agent Jesus Gomez who told him that he was wanted on a

bench warrant. Hopkins claimed he would turn himself in to authorities. However, Hopkins ran and hid, first in Atlanta, and then, for many months, in Los Angeles. Further, there was evidence adduced at trial to support the claim of several witnesses that, after fleeing, he continued to sell and traffic in PCP unabated. He was finally captured by U.S. Marshals after months of hiding to avoid prosecution.

II.    HOPKINS SHOULD RECEIVE A LIFE SENTENCE FOR HIS CRIMES

The United States has filed repeat papers in this case and has served them personally on the defendant in open court before the commencement of the motions hearing and the swearing of the jury. Pursuant to 21 U.S.C. §841(b)(vi), the defendant had two or more prior convictions for a felony drug offense which had become final when he committed and was charged with the offense of conviction. Therefore, according to the plain language of the statute, he ". . .shall be sentenced to a term of life imprisonment without release . . ." Id. Apart from this statutory mandate, Hopkins deserves a life sentence.

A.    Convictions One and Two.

On April 28, 2000, Hopkins was sentenced in two felony cases. In Case CT962486X, he was sentenced after having pleaded guilty to Possession With Intent to Distribute Cocaine, a felony under the laws of the State of Maryland, and he received a sentence of one year, to be served concurrently with CT98088A. In case number CT98088A, he was sentenced after having pleaded guilty to Manufacturing or Distributing Cocaine, a felony under the laws of the State of Maryland, and he received a sentence of one year which was to run concurrently to the sentence in CT962486X.

5

B.     Conviction Three.

On June 25, 1995, Hopkins was sentenced after having pleaded guilty to Possession with Intent to Distribute Cocaine in case number CT950136X, a felony under the laws of the State of Maryland, and he received a sentence of one to five years in prison, all but 135 days suspended.

C.     Conviction Four.

On September 27, 2002, Hopkins was sentenced in case number CT020270X, after pleading guilty to Second Degree Assault, a felony under the laws of the State of Maryland, and the sentence he received was four years of incarceration, all but 18 months suspended, three years supervised release, and a fine.

D.     The Defendant's History Merits a Life Offense.

Hopkins has been selling drugs for his entire adult life and has had no genuine long-term legitimate employment.  His criminal history - in terms of real facts - shows an adulthood wasted on consistent criminal activity.

1.     Hopkins Also Sold Cocaine While in the PCP Conspiracy.

During the period of the conspiracy, Hopkins also purchased cocaine and even helped Darnell Kinard Jackson (Darnell Jackson's uncle) cook powder cocaine into crack for resale.  At the time of the search of Hopkins' father's home, agents recovered a digital scale and a large number of small zipper-style plastic bags of the type used to package cocaine for resale.  Further, Hopkins had a long history of selling crack cocaine, and calls reveal that Jackson sought Hopkins' "expertise" in an effort to help his recently-paroled uncle find a way to make fast money.

6

      2.      <u>Hopkins Also Illegally Possessed Firearms While in the PCP Conspiracy</u>.

Hopkins possessed several firearms during the period of the conspiracy, which he could not legally possess since he had previously been convicted of several felonies. These guns were recovered in the search warrant of his parents' home and were shown on videotape. Cooperators testified that there guns were used to protect his drug money and his drugs.

      3.      <u>While Wanted on the Indictment, Hopkins Continued to Sell PCP</u>.

Hopkins continued to sell PCP to wholesale suppliers in suburban Maryland after July 27, 2006. After he spoke to S.A. Gomez on the telephone and was advised he was wanted, Hopkins moved to Atlanta, Georgia and stayed there until agents stopped a car driven by a female criminal associate of Hopkins. After that traffic stop, Hopkins moved to Los Angeles where he was housed and sheltered by the family members of Tinesha Adams. While hiding in Los Angeles, Hopkins continued to buy PCP and ship it back to suburban Maryland.

      4.      <u>Hopkins' Flight Showed Contempt for the Law</u>.

When at last he was arrested in May 2007, in a gambling casino in Los Angeles, Hopkins had been at large for many months, even though he knew that the case was set for trial and that all of the other defendants were awaiting his apprehension. During that flight, Tinesha Adams and her family provided support for Hopkins and otherwise enabled his continued drug sales. Sadie White, a relative of Adams, rented apartments for Hopkins in her own name while Hopkins was on the run. White was with Adams when Adams was arrested after being a fugitive for many months. Also, Hopkins had been told by S.A. Gomez that he was wanted. Therefore, Hopkins cannot dispute that he knew he had a bench warrant and he elected to obstruct justice.

5.    Police Records Show Hopkins is a Career Drug Seller.

          a.    December 24, 1994, Arrest for Possession with Intent to Distribute Cocaine.

On December 24, 1994, Troy Hopkins was arrested by Prince George's County Police.  The arrest took place after a car stop in which officers recovered two rocks of crack cocaine.  During a search at the station, officers located more than 60 rocks of cocaine on Hopkins' person.  At the time of the stop and arrest, Hopkins gave his address as 5601 Lundy Drive in Lanham, Maryland. Hopkins pleaded guilty to this offense in November 1995.[1]

          b.    November 9, 1996, Arrest for Possession With Intent to Distribute Cocaine.

On November 9, 1996, responding to a call about an assault in a high drug trafficking area, police approached a group of young men sitting outside 7440 Landover Road in Landover, Maryland.  Troy Hopkins was among these young men.  Officers discovered that Hopkins, then a convicted felon, had a 9 mm pistol, a bag containing 32 grams of crack, and over $1,600 in U.S. currency.  At the time of his arrest, the defendant told police his name was Brian Raines.  Later, police approached Alfred Hopkins, Troy Hopkins' father, and asked his permission to search Troy Hopkins' car.  Alfred Hopkins, a police officer himself, consented to this search and further advised police that Troy Hopkins was the only person who used the car.  Officers opened the door and searched a hidden compartment in the door panel where they found 32.1 grams of crack cocaine, razor blades, numerous small plastic bags with zipper locks and two identification cards for Hopkins. On August 11, 1998, Hopkins pleaded guilty to this offense.[2]

---

[1]

On November 3, 1996, the defendant was arrested in Landover, Maryland after he was found trespassing in an abandoned apartment where he was throwing dice with a crowd of young men.

[2]

On April 30, 1997, the defendant was given a citation after officer located marijuana in a vehicle

     c.    <u>November 20, 1997, Possession With Intent to Distribute Cocaine and PCP</u>.

On November 20, 1997, Hopkins was arrested and charged in a 15-count indictment in Prince George's County, Maryland with a variety of drug crimes, among them possession with intent to distribute PCP, cocaine and heroin, and possession of a handgun during a drug trafficking offense. The defendant was the target of a narcotics investigation in Maryland wherein detectives targeted a possible stash house used by Hopkins near Sheriff Road. Acting on information developed in that case, including several trash recoveries that turned up repeated evidence that cocaine was being packaged in the residence, officers obtained a search warrant for that residence. On the date the search warrant was executed, Hopkins was seen driving from the search location in a BMW registered to his father, Alfred Hopkins. Inside the search location officers located 122 grams of crack cocaine, 125 grams of powder cocaine, 227.7 grams of marijuana, 35 grams of PCP, 1.4 grams of heroin, over $1,500 in U.S. currency, an electronic scale, small zipper-style plastic bags, a shotgun, and other items. The defendant pleaded guilty to this case as well.

     d.    <u>January 27, 2002, Gun Assault and 2004 Home Invasion</u>.

On January 27, 2002, Hopkins went to his neighbor's house with a loaded .38 caliber Smith and Wesson pistol and pointed the gun at his neighbor. The neighbor wrestled the gun away from Hopkins and called the police. While being transported to the station, Hopkins spontaneously complained that he was tired of people stealing from his father.

     e.    <u>Exposing his Family Members to Robbery/Home Invasion</u>.

In 2004, the elder Mr. Hopkins, Alfred Hopkins, was the victim of a home invasion robbery. Mr. Alfred Hopkins told the police that the robbers were masked and that they took over $10,000

---

Hopkins was driving, and packaging material in the trunk.

9

cash.  The government's witnesses and police reports showed that Alfred Hopkins routinely held his son's drug money and loaned his firearms (seven of them) to his son and his nephew to guard their drug money.  When police asked Alfred Hopkins to identify the robber, he stated he could not identify them.

      e.    <u>January 24, 2004, Interdiction Burbank Airport</u>

Hopkins' earlier encounter with police in Los Angeles reveal the genesis of the instant conspiracy.  On the morning of January 24, 2004, the mother of Hopkins' child, Marquita (Kim) Booth, was stopped in Burbank, California Airport.[3]  Flight records showed that Hopkins traveled with Booth and a man named Russell Stringfield to Los Angeles the day before Booth was stopped.  At the security checkpoint for departing passengers, Booth and Stringfield's luggage were searched.  In it, agents found one and a half gallons of PCP contained in Infusium brand shampoo bottles, and Listerine brand mouthwash bottles.  Paperwork linked Booth and Stringfield to a hotel on West Century Boulevard, near LAX.  Interdiction team members thought it was odd that Booth and Stringfield had traveled all the way from the immediate area of LAX to the San Fernando Valley's Burbank Airport.  They called their counterparts at LAX and suggested they look at the hotel.  At about the same time, Hopkins was stopped trying to clear security at LAX.  His luggage was redolent with the smell of PCP, but no PCP could be found on his person.  Instead, agents located a hotel key which was eventually traced to the same hotel room as Booth and Stringfield.  Hopkins was eventually let go because he did not have the PCP on his person.  However, when agents approached

---

[3]

Burbank is a town in the San Fernando Valley.  It is within Los Angeles County.  Southwest Airlines serves Burbank Airport and LAX.  Southwest Airlines provides service to Thurgood Marshall Baltimore Washington Airport in Baltimore, Maryland, near Hopkins' home.

the hotel room, they found a PCP trafficking operation was in full swing. Through the drapes, agents could see the men running frantically back and forth to the bathroom. Eventually agents gained entry and found many Infusium and Tresseme brand shampoo bottles in the bathroom. PCP liquid had been spilled across the floor at the base of the toilet in what was an obvious attempt to destroy it. A towel soaked with PCP liquid was also found in the bathroom, the remnants of a failed attempt to clean up the spilled PCP.

Agents learned that one of the occupants of the Motel 6 room had stayed at the Renaissance Hotel nearer to LAX the night before the seizure at Burbank Airport. They went to that room to look for further evidence of PCP. In the closet, in a black bag, agents located another gallon of PCP.

In telephone calls to an incarcerated relative, "Brooks" (Seldon Brooks Shelton), Hopkins discussed this seizure.[4] Further, Hopkins told Brooks that he would be changing his name and that he would let Brooks know what name he would be using in the future so that he could remain on Brooks' authorized visitors list.[5] He explained that "Lo" (Dialho Cobham) got caught with "three" (meaning three gallons, which is the amount officers seized from Cobham) and he complained that he had lost "about 80" ($80,000 was the wholesale value of the drugs seized).

---

[4]

All prison calls are recorded using the Inmate Phone System. Anyone using this system is advised by a recorded voice that the call is being monitored and recorded.

[5]

In the call, Hopkins also told Brooks that he would go get new identification on Alvarado, meaning Alvarado Street in Los Angeles, where fake identification cards are often sold to illegal immigrants from the numerous tiendas - small ethnic grocers that often provide legal or illegal wire remitter services and sometimes provide false identification cards.

In the Bureau of Prisons, inmates cannot receive unauthorized visitors. Therefore if Hopkins changed his name, his relative would have to change the name on his authorized visitation list in order to receive Hopkins as a visitor.

      f.     March 14, 2004, Interdiction of PCP.

On March 14, 2004, Federal Express Employees at the facility in Crofton, Maryland called the DEA after they located a suspicious package destined for suburban Maryland. The package was sent from Los Angeles, a known source city for PCP. The package was opened and found to contain PCP. A controlled delivery of the package was later made and the police arrested the addressee of the package. The addressee informed police that he received the package on behalf of Troy Hopkins and that he was supposed to deliver it to Hopkins. At the urging of police, the addressee made a controlled call to Hopkins. In the call, the addressee and Hopkins agreed to meet at a Papa John's Pizza in Maryland. Plainclothes officers waited at the Papa John's and observed Troy Hopkins arrive at the parking lot. Hopkins appeared to recognize the officers after he entered the Papa John's and he turned to leave. Approximately two weeks later, the addressee was savagely beaten at the Safari Steak House, where members of the current conspiracy often met to exchange PCP and money.

      g.     June 23, 2004, Cocaine Buy.

Using a cooperating source (CS), the Drug Enforcement Administration made a controlled buy of cocaine from Hopkins. Hopkins told the CS that he had a "half a chicken" left, meaning a half a kilo of cocaine. The CS told Hopkins that the CS would like to buy 32 grams of crack the following day. In a recorded call, the CS telephoned Hopkins' cell phone and placed an order for the drugs. Hopkins then directed the CS to meet him at his parents' home at 5601 Lundy Drive in Lanham, Maryland. Hopkins' father, Alfred Hopkins, opened the front door for the CS and Troy Hopkins directed the CS to the garage where he sold 32 grams of crack cocaine to the CS.

      h.      August 20, 2005, Arrest for Possession With Intent to Distribute Cocaine and Possession of an Unregistered Firearm.

On August 20, 2005, Hopkins and two other men were arrested in a car registered to Hopkins. In the passenger seat's map-pocket officers located plastic bags containing over 60 rocks of cocaine base and over $2,000 in U.S. currency. On the floorboard, officers recovered a loaded pistol.[6]

III.      THE DEFENDANT'S FORMATIVE YEARS DO NOT REVEAL ANY EXCUSE.

The defendant was raised in a quiet suburban neighborhood by a police officer father, and a federal government employee mother. He attended a private high school. As a teen he chose to live a life on the streets, selling drugs, not working, and gambling his profits away. The government is not aware of any hardship in his childhood that would have thrust him into a life of crime. On the contrary, he had opportunities and benefits many drug dealers never had as children.

---

[6]

The pistol had been stolen from Prince George's County Maryland where Hopkins lived.

IV.     <u>CONCLUSION</u>

The defendant should be sentenced to a mandatory life sentence.

*Wherefore*, we request that the defendant be sentenced accordingly,

                                               Respectfully submitted,

                                               JEFFREY TAYLOR
                                               United States Attorney
                                               Bar No. 498-610

                                               _____

                                               S. Elisa Poteat
                                             Assistant United States Attorney
                                             555 4th Street, N.W.
                                             Washington, DC 20001
                                             Bar. No. 420-604

                                             _____

   _____     Emory V. Cole
                                             Assistant U.S. Attorney

<u>CERTIFICATE OF SERVICE</u>

     I HEREBY CERTIFY that I caused a copy of the foregoing to be served upon the attorney for the defendant on May 9, 2008.

                                               _____

                                             S. Elisa Poteat
                                         Assistant United States Attorney

Defense Counsel:
Mr. Cary Clennon
Attorney for Defendant Troy Hopkins
Clennon_law@comcast.net

14