UNITED STATES DISTRICT COURT FOR THE DISTRICT of COLUMBIA

United States of America,

    Plaintiff,

vs.

Troy Hopkins,

    Defendant

Case No.: 06-227 (RBW)

**FILED**

MAY 14 2008

Clerk, U.S. District and Bankruptcy Courts

<u>Defendant's Motion to Suppress Evidence Obtained from Interception of Wire Communication</u>

**COMES NOW,** the Defendant Troy Hopkins, moving Pro Se, pursuant to 18 U.S.C. § 2518(10), Rule 12(b)(3)(c) of the Federal Rules of Criminal Procedures, and the Fourth Amendment of the United States Constitution, hereby respectfully moves the Honorable Court to reconsider its denial of Hopkins' prior motion to suppress the contents of all intercepted wire communications and seized communications, and all evidence derived there forth.

<u>Statement of Facts</u>

Hopkins incorporates FBI Agent Tim Ervin's statements made on May 2, 2006, regarding the affidavit he used to obtain authorization for the interception of wire communications to and from telephone number 202-446-4546.

Title III requires that an application for a wiretap order contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." United States v. Stewart, 306 F.3d 295, 304 (6th Cir. 2002) cert. denied, 537 U.S. 1138 (2003) (quoting 18 U.S.C. § 2518(1)(c)). Consideration of

alternative law enforcement methods is central to the issuing court's necessity inquiry. See United States v. Ippolito, 774 F.2d 1482, 1485 (9th Cir. 1985). Although an investigative agency need not exhaust all possible investigative techniques before requesting a wiretap. United States v. Homick, 964 F.2d 899, 903 (9th Cir. 1992), It must demonstrate that "normal investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time." United States V. Spagnuolo, 549 F.2d 705, 710 (9th Cir. 1997). Where ordinary investigative techniques have not been employed, the affiant must show that employment of such techniques "reasonably appear unlikely to succeed if tried or to be too dangerous." Id. Boilerplate assertions that the standard is met based on an agent's knowledge and experience will not suffice. Id. Instead, the affidavit must contain an "adequate factual history of the investigation and a description of criminal enterprise sufficient to enable the issuing court to determine on its own whether there is the requisite necessity for the use of a wiretap. See id. The court's inquiry should be guided by common sense and practical considerations. United States v. Echararria-Olarte, 904 F.2d 1319, 1396 (9th Cir 1990). The Supreme Court has told us that the requirement is "simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime," United States v. Kahn 415 U.S. 143, 153n.1239 L.Ed. 225, 94 S. Ct. 977n. 12(1974).

The Court previously denied Hopkins' request on this motion. Now, considering Agent Ervin's testimony during trial, Hopkins submits that Ervin's representation to the issuing judge were materially false, misleading and demonstrates that his affidavit in support of an interception order were made up of uncorroborated thoughts and opinions and were entirely taint.

## Other Investigative Techniques Available

Stating that normal investigatory procedures have been tried and have failed or will be too dangerous to employ, Agent Ervin fails to adequately describe why this is so. He believes that interception of wire communications is an avail technique in developing and securing admissible evidence against Darnell Jackson, also known as "Fats," an unknown black male using the nickname "T" (possibly Tony Hilt), Bernie Hargrove, Keith Roots, also known as "Slow," Dominique Washington, Shawntae Anderson, Tinesha Adams, Mary Walker, an unknown black male using the nickname "John D.," The affiants explanations are baldly conclusive and insufficient. See United States v. Spagnuolo, 549 F.2d 705 (9th Cir. 1979); United States v. Lilla, 699 F.2d 99 (2nd Cir. 1983); United States v. Mondragon, 52 F.3d 291 (10th Cir. 1995)

The record in this case does not support the conclusion that other investigative procedures were either unlikely to succeed or were too dangerous to use. If anything, the record establishes the contrary propositions; the normal investigative procedures that were used were very successful. From the very beginning of the investigation traditional techniques were used by the affiant which were successful. The first meeting by CW-1 on November 18, 2005 with a recording device given to CW-1 to use while meeting with Jackson and while the affiant was surveying the meeting, important information was recorded. A few weeks later through another confidential source (CW-2), it was learned that Jackson had just arrived in Los Angeles and that he was about to purchase a large quantity of P.C.P. Two days later CW-2 met Jackson in an office of the same club the affiant surveyed CW-1 and Jackson in front of weeks before. This meeting detailed a conversation between Jackson and his source of supply and where the source of supply cooked his P.C.P. due to the comfort Jackson had with CW-2 and due to the fact his entire phone call could be heard because Jackson was talking

on speakerphone at the time. Jackson also showed CW-2 two gallons of P.C.P. during the first of these two meetings.

On January 9, 2006 a big lead comes to the affiant and his investigation where CW-3, who is a trained and experienced operational informant, meets with Jackson at the same club the first surveillance was taken and was informed by Jackson he had a supplier of P.C.P. in Los Angeles who was selling gallons of P.C.P. for $13,000. Jackson then offers to fly to Los Angeles with CW-3 to make a purchase of P.C.P. for him. Jackson then provided the CW-3 with more information on how the P.C.P. was transported, what the P.C.P. was transported in, and how he had two females, who were believed to be from Los Angeles, to do the transporting. He also explained to CW-3 what he paid the females couriers. This meeting and the next couple of meeting between CW-1, and Jackson and CW-2 and Jackson proved to be also important. In these meetings Agent Ervin learned of the names and numbers of other co-conspirators with the help of pen registers. Ervin also learned that the supplier has a P.C.P. laboratory set up in a shed behind someone's house, that two females couriers work for the Los Angeles supplier, and Jackson pays anywhere between $12,000 to $15,000 in Los Angeles and when he sells in D.C. he gets up to $40,000. CW-3 was also told what airline was used and why they used Long Beach airport instead of Los Angeles Airport. Jackson continued to provide CW-3 with more pertinent information telling him that when they traveled how to conceal his money easier by using all $100 bills. March 9, 2006 using traditional methods some of biggest leads in this investigation came to light when CW-3 flew with Jackson on Jet Blue Airways to purchase P.C.P. from the Los Angeles Supplier.

Earlier the same morning before the flight FBI agents met with CW-3 to provide him with a vehicle equipped with interior audio and video

recording equipment. This trips proved to be a vital part of the investigation. With help from the Los Angeles D.E.A. and the use of normal procedures they were able to follow Jackson to the source of the supply. Using surveillance procedures the F.B.I. watched Jackson at the hotel he stayed in and watched drive off with the two females couriers he was using. The Agents surveyed Jackson's whole operation and was able to get pertinent information about what beauty supply store he got the bottles to put P.C.P. in and a description of the female couriers and the source of supply.

These meetings, with CW, recorded calls, trip to Los Angeles, surveillance procedures, and pen registers all give an example of how the affiant made misstatements and mislead the issuing judge in the affidavit. Page 5 in paragraph 10, the affiant lists, A through E for the types of communications sought to be intercepted.

    A. The date and time of telephone calls made to the target telephone by co-conspirators, customers, and other criminal associates.

    B. The numbers of these co-conspirators, and other associates.
        I. The Dates and times of calls from conspirators, customers, transporters, and even the source of supply were documented in the affidavit. This information was received on just a few of the meetings by CW-2 and CW-3 with Jackson. For example the meeting with CW-3 on February 21, 2006 CW-3 was able to get a peek of Dominique's digits and with the help of the pen registers the F.B.I. agents were able to obtain one of the key transporter's telephone numbers and what time the call was placed.

    C. The identities of co-conspirators, customers and criminal associates.

  I. The surveillance procedure used by the F.B.I. more than accommodated the F.B.I. with the identities of co-conspirators, customers, and criminal associates of Darnell Jackson. This normal investigative procedure led the F.B.I. to descriptions of the females couriers and source of supply. Jackson was not an elusive individual. Jackson usually met people at his club. Further exhaustion of surveillance would have easily led to identities of other co-conspirators, customers, and criminal associates of Jackson.

D. The dates and times for the commission of the aforementioned offenses.

E. The weights, purchased prices, and other information about the control substance.

  I. Examples of the dates and times of the offenses is in the record of the affidavit. Jackson liked to keep CW-2 and CW-3 informed on a lot of his moves. He would call them when he was on his way out of town, and coming back into town, letting them know ahead of time of his comings and goings. One good example is when Jackson calls CW-3 from the airport on January 17, 2006 and let him know his whole itinerary.

  II. Jackson was very comfortable around the CWs he would talk to his couriers and source of supply right in front of CW-2 and CW-3 using speaker phone so that they could hear the whole conversation.

The affiant makes misstatements and misleads the issuing judge throughout the May 2nd affidavit. Starting with page 32, paragraph 73. Where the affiant states he believes that the interception of wire communications to and from the target telephone is the only reasonable

method of developing evidence of the full scope of the suspected violations being committed by Jackson and his organization. Clearly the affiant must have thought the issuing judge was not going to read the whole affidavit. The trip to Los Angeles shows the full scope of Jackson's organization. The second part of this paragraph the affiant continues to mislead the court by stating,

> "This is because all normal investigative procedures <u>have been tried and have failed, appear reasonable unlikely to succeed if attempted or continued, or are too dangerous to employ further in this investigation.</u> Normal investigative procedures that have been employed in this investigation to date have included, but not limited to the following, 'surveillance' debriefings of cooperating witnesses; consensual recording of telephone conversations; a controlled purchase of P.C.P.; review of pen register records for the target telephone; review of airline records' and review of public records. While this information has been probative in establishing substantial evidence that an ongoing illegal narcotics business is operating, <u>it has not yielded sufficient evidence or ascertained the identities of, and proven beyond a reasonable doubt,</u> the guilt of all the participants in this illegal conspiracy. <u>This includes the person who supply and assist in the transportation of the narcotics controlled substances</u> as well as the distribution of proceeds from illegal activates."

Such generic language is far from specific about the inability to use normal investigative procedures and traditional methods to uncover specific information. The Ninth Circuit explicitly prohibited such "sidestepping" of the necessity requirement with general allegations

about "drug conspiracies." Ippolito, 714 F.2D at 1486. By enacting the necessity requirement of section 2518(1)(c), Congress sought to limit the use of wiretap to situations in which traditional investigative techniques have been tried but found unlikely to succeed. See Legislative History of Omnibus Crime Control and Safe Streets Act of 1968, 1968 U.S. Code Cong and Admin Views 2112, 2190-91. In this case, the government launched a successful investigation that uncovered promising investigative leads. Rather than pursuing these leads with traditional methods, the government sought a wiretap.
To obtain judicial authorization for the wiretaps, the government could not reveal the full potential of its traditional investigation. The affidavit misstated several facts. It omitted and buried others.

Not coincidentally, the other investigative procedure section was laden with boilerplate language and one-sided account of <u>potential</u> failures of the investigation. The affidavit does not at the outset describe the specific goals of the investigation and then explain why traditional investigative methods are unlikely to achieve those goals. Instead, this section concludes with a laundry list sought after information and borrows language from section 2518(1)(c) to the effect that "it is my belief that normal investigative procedures have been tried and have failed appear reasonably unlikely to succeed if tried or are too dangerous." The generic quality of this section coupled with its one-sided defects in the ongoing investigation effectively mislead the issuing judge about the promise of traditional investigative methods.

The Affiant again makes more bold misstatements in the second part of paragraph 72 and in paragraphs 73 and 74 on page 33, where he claims his training, experience and knowledge about the investigation leads him to believe that the wiretap is the only means to establishing the

full scope of the investigation. He goes on to misstate that an undercover agent might be able to introduced and make buys from Jackson but the affiant believes he will not be able to assist in identifying the Los Angeles source. The irony in this is that with the help of CW-3, and surveillance of the trip Jackson led agents straight to the Los Angeles supplier. They didn't need for the CW to be able to identity him because the Agents had him on video.

In United States v. Spagnuolo, 549 F.2d 705 (9th Cir 1977), the Ninth Circuit discussed the role that an agent's law enforcement experience should play in his obligation to reveal facts pertaining to the exhaustion of traditional investigative tactics to the issuing judge. The Ninth Circuit declared that the affidavit's description of the investigative tactics that have been tried must be

> "sufficient to enable the district judge to determine, independently of an agent's assertions with respect to his or her agents' experiences, that ordinary investigative techniques very likely will not succeed or that their use will imperil life, or in some other specific way to be dangerous." Id at 710 (emphasis added)

The court went on!

To delay the wiretap order while ordinary techniques are employed or to undertake to educate a district judge to enable him to appreciate their level of experience no doubt appears to such agents as a waste of time and resources. Their perception may be accurate, but Congress has deprived it of decisive influence. The particularized showing here described is necessary. The district judge, not the agents, must determine whether the command of Congress has been obeyed.

The affiant's assertion about the capabilities that an introduction of an undercover agent will provide the investigation is immaterial. The CW-3 trip with Jackson tied up most of the lose ends for the government, because this trip led the F.B.I. to the Los Angeles source. There was no need to introduce a undercover agent at this point because the government had the main players, Jackson, the female couriers and the source of supply. The affiant goes on to misstate facts in paragraph 74 page 33 by saying,

> "In addition the undercover agent would not be able to identify all of the other members of the organization assisting Darnell Anthony Jackson and other subjects listed above in obtaining and redistributing large quantities of P.C.P. The Affiant goes on to use boilerplate language in describing how an undercover agent would not be able to find out how the organization dispose of their proceeds."

He goes on to help the defense theory by saying basically CW-3 will be of greater help to the investigation because he has already penetrated Jackson's alleged organization. The affiant does not explain everything he has more than just penetrated he has basically become a key player in the organization. Jackson was flat broke at the time they went to Los Angeles, and by CW-3 giving Jackson the money that basically puts him back on his feet he feels he is obligated to CW-3. The affiant does not disclose in the affidavit that CW-3 and Jackson are also in the music business together. They were currently working on an album involving other members of the conspiracy. The affiant probably leaves this out because it would have led to other exculpatory evidence which may have deterred the issuing judge to grant the wiretap. If the affiant would have disclosed that the CW-3

worked daily at the club in the studio with other members of the conspiracy and had access to the studio at anytime the issuing judge may have not seen a need for a wiretap. Being as though Jackson basically lived above the club where an apartment was, that he used. By the CW-3 having access to the club and studio he could have easily planted surveillance devices in the club or club office. The affiant also leaves out the way Jackson carries himself. Jackson is a wiretap, he is very boastful, likes to be seen and heard, and tells all his business. Just by the CW being around Jackson he was able to find out any information that the F.B.I. needed. The F.B.I. already had a walking and talking wiretap through Jackson. The record reflects that the most pertinent information always came when Jackson was directly with either of the CWs.

When law enforcement officers circumvents the procedural requirements of 18 U.S.C. 2518(1)(c), courts must suppress the evidence obtained from the illegal wiretap. Courts, for instance will suppress evidence derived from warrant issued on the basis of an affidavit that contains false statements regarding necessity. See, e.g., United States v. Ippolito 774 F.2d 1482 (9th Cir 1985). Also according to United States V. Ippolito, Suppression is appropriate if: (1) the affidavit contains misstatements or omissions made with intent to deceive the issuing judge, or with a reckless disregard for the truth, that were material to the necessity determination; and (2) the omissions that are inserted does not disclose the requisite necessity for a wiretap.

On page 34 the affiant goes on to describe methodology employed by Jackson and his alleged criminal associates. He also details that by using normal procedures March 9th trips, flight records, CW's gatherings, he provides the names on almost everyone who was eventually indicted in the conspiracy except for one person. In

1  addition on March 9th, the F.B.I. was able to link the females couriers
2  together since all of them have traveled together one time or another.
3  By using information from CW-3 other names were found out of who were
4  involved in the conspiracy, John D, and Troy Hopkins, who were also
5  alleged to be co-conspirators of Jackson.
6
7  The affiant shows reckless disregard for the truth and deceives the
8  court by misstating that regular surveillance of the movements of the
9  suspects would most likely be notices, causing them to become more
10 cautious in their illegal activities. He also misstates that this may
11 cause them to become more cautious in their illegal activities and
12 this may cause a real threat to the safety of CW-3. The affiant refers
13 to the record when the so-called counter surveillance used by Jackson
14 on the November 18th meeting with CW-1 in front of Jackson's club.
15 Further investigation by the agents would have found that Jackson's
16 so-called counter surveillance was a homeless guy who lived camped out
17 on the sidewalk in front of the Laundromat across the street where the
18 surveillance was taken place. With the experience and training of the
19 affiant and his team they should have been able to work around
20 "Jackson's counter surveillance." The mention of the safety of CW-3 is
21 a blatant lie to mislead the issuing judge. This incident happened
22 months before CW-3 even took the trip to Los Angeles with Jackson
23 between these times Jackson did not draw away from CW-3 but got closer
24 with him. This was not a case in which the undercover agent aroused
25 suspicion that he was a police officer, cf United States v. Blanco,
26 1994 U.S. Dist. LEXIS21331, 1994 WL 695396 at, *6 (ND Cal Dec 8,
27 1994); nor a case where a prolonged investigation proved unable to
28 gain the defendants complete trust, cf United States v. Spangnolo, 549
29 F.2d 705 (9th Cir 1977) (nine month undercover operation unable to gain
30 the targets trust); United States v. Commito, 918 F.2d 95 (9th Cir
   1990) (ten month investigation). Instead after only two months of

continuous contact CW-3 was invited to work with Jackson in a couriering operation. The affiant makes assertions that even though the CW accompanied Jackson to Los Angeles, CW-3 was not able to go with Jackson to meet the source of supply or even to the neighborhood, the affiant does not disclose that during the surveillance of Jackson leaving the hotel where CW-3 stayed, the agents were able to get video footage of the female couriers, vehicles used by the couriers, source of supply, vehicle and storage locations of the source of supply. The affiant shows reckless disregard misleading the issuing judge by not omitting these facts with his assertions during these misstatements.

The affiant intentionally or recklessly omitted from his affidavit several material items of information. This information included some pertinent information that was material that the government had control of a cooperator who was not mentioned in this whole case. Russel Stringfield, who has been uniquely situated to infiltrate Jackson's allege conspiracy and make undercover purchases. For whatever reasons, the government chose not to do so. The government made no attempt to introduce an undercover officer or informant to any of the other targets in an attempt to get to Jackson's alleged organization specifically that suggest that to do so would be unlikely to succeed or dangerous. See Rice, 478 F.3d at 708. Russel Stringfield was a close friend to Defendants Hopkins and Jackson and was employed at the club as manager. Stringfield was in charge of opening up the club, advising security and collecting the money from the door and bar during events. Mr. Stringfield had keys to the club and 24 hour access to the facility. Mr. Stringfield and Defendant Hopkins friendship extended far beyond the Senate Inn club. Mr. Stringfield named Defendant Hopkins as Godfather of his child. Mr. Stringfield was in perfect position to take inside photographs; to open the facility and give Government officers access to the entire facility. The affiant

makes assertions that due to the meetings that were often held in the club office, the surveillance was limited. The government could have used CW-3 or Mr. Stringfield to plant bugs in the office or hidden cameras. Jackson often used Stringfield to do electrical work since Mr. Stringfield was good at doing these types of things. Mr. Stringfield even set up the clubs surveillance cameras and put TV's around the club. Mr. Stringfield was an inside source for gathering pertinent information and was experienced in doing undercover work for the government. The government has used Russel Stringfield for years to gather information on the Defendant Hopkins, Stringfield has worked with audio listening devices for the government to gather pertinent information on Defendant Hopkins in the past. For whatever reasons, the government chose not to do so in this case. The government surveyed Mr. Stringfield the first time Defendant Hopkins was surveyed in a vehicle in front of the club. In this video you clearly see Mr. Stringfield going in the trunk of the vehicle getting supplies and food and entering the club. Mr. Stringfield drove the club van to do promotions, advertisement and for personal uses. Jackson would allow Mr. Stringfield access to his vehicle and apartment, which was above the club. For whatever reason the government decided not to exhaust these means.

Although we do not know for sure whether Stringfield was providing the government with information about Jackson or Hopkins at the time - as opposed to other suspected or known drug dealers - it is virtually inconceivable that Jackson's suspected drug operation was not a critical part of Stringfield's cooperation. If it was, the failure of Agent Ervin to spell out the details of Stringfield situation and his potential investigative use in this case is inexcusable and indicates an intentional or reckless disregard of the Affiant's duty to make a

full disclosure of possible investigative techniques under 18 U.S.C. § 2518(1)(a).

The reasonable inference to be drawn is that Agent Ervin failed to spell out the details about Stringfield for fear that the request for a wiretap might be denied. Accordingly, this deliberate failure may well require suppression. See United States v. Rice.

The affiant continues to show reckless disregard and misleads the issuing judge by using boilerplate language and stealing lines from the 2518(1)(c) mentioning how even though CW-3 penetrated Jackson's alleged organization he still would not be able to find out about others involved and the full scope and methodology used by Jackson and alleged co-conspirators. This is absurd, on its face. The record of the affidavit clearly shows how Jackson broke down the whole operation, using traditional methods which involved putting audio and video devices in a vehicle given to CW-3 by the F.B.I. This methodology the affiant claims he could not get without the wiretap was given to him and was recorded and video taped when CW-3 and Jackson drove from the airport. The affiant recklessly omitted from his other assertion the conversation from the airport where Jackson instructed CW-3 how he mixes P.C.P. He spoke about the Los Angeles supplier, and how often they cooked the P.C.P. He told CW-3 how many gallons were cooked at time and which days they where cooked. Jackson continued to discuss pertinent information about how the source felt about him coming regularly, how many gallons he was buying form the supplier each month and how he made $500,000 in 30 days. The affiant makes assertions about how Jackson and the Los Angeles source is very secretive and how the CW-3 would not be able to gain the trust that it will take for Jackson to let him know more, full scope about his alleged organization. This conversation contradicts everything the

affiant states. Jackson continues to talk with CW-3 about the female couriers, what they are paid, who pays them, and who controls them. Using more traditional methods Bernie Hargroves and John D's conversation was heard and recorded. By using the pen registers the times of these calls and their telephone numbers were received. The F.B.I. surveilled the undercover vehicle from Dulles Airport to 3323 10th Place S.E. Washington, D.C. This is a location where the CW-3 learned Jackson used to dilute his P.C.P. This March 9th trip to Los Angeles led to seizure of 64oz of P.C.P. and mountains of evidence that contradicts every assertion made by the affiant on why it is a necessity for the wiretap.

As for Agent Ervin's conclusion the search warrants would have been unproductive, would have tipped off the organization, that the warrants would not give the historical records and physical evidence sufficient to show the extent of the organization, or how proceeds are disposed of, part of this could have been accomplished through the Grand Jury, which the agent also did not adequately explain its non-use. As the Grand Jury proceedings are secret, records of lambs could have been obtained through non-disclosure subpoenas. Witnesses could have been interviewed in the Grand Jury and while it might not have revealed each and every member of the conspiracy, coupled with search warrants and other records and surveillance would have done so. The affiant also asserts that pen registers and the analysis of them were of no further use. This is another boilerplate misstatement. His affidavit noted that the analysis was providing investigative leads and intelligence, producing contact numbers and was useful in identifying alleged co-conspirators. The complaint was not that the method was not providing information but that it was not producing "real time information." However the method should have been exhausted, as required by the necessity showing for a wiretap, to

verify that all of the members of the alleged conspiracy could not be identified. These leads from the pen registers had not been exhausted by physical surveillance. All of the other techniques listed by the affiant continued to produce results and appear to have so overwhelmed the government with information that they could not fully utilize it. Thus, the government, out of expediency rather than necessity, sought to obtain the wiretap.

The affiant also notes that prolonged or regular surveillance of the movement of the suspects would most likely be noticed - yet he fails to note that surveillance of the club began in November of 2005 and lasted until the summer of 2006 without any apparent discovery by the targets. Continued surveillance of the targets, including the use of pole cameras and roving surveillance , and the surveillance of homes and workplaces, would have provided the government with much more information about the movements of the targets and their associations, without the need to resort to electronic surveillance. In sum, the affiant merely makes a bold assertion that further surveillance would not be useful and fails to provide the issuing court "with sufficient information ... to determine whether physical surveillance was too dangerous to be attempted." See Rice, 478 F.3d at 707.

If one would simply state Agent Ervin's affidavit concisely, the investigation had been going for only a short period of time and had not reached an impasse with traditional law enforcement techniques. The results of these techniques continued to grow exponentially and had not been exhausted. The affiant's assertions regarding the limited use and viability of other investigative techniques suffer from the problem that he discussed the typical problems with the techniques in typical drug cases, but makes no references to any facts about Jackson

specifically that would make these techniques ineffective or dangerous. See Rice, 478 F.3d at 708.

We contend that the affidavit in support of the application for the wiretap inadequately describe why normal investigative procedures will be or have been unsuccessful or will be too dangerous in this case. We argue that the affidavit contains only boilerplate conclusions as to why normal investigative procedures will fail, which are based not upon the circumstances of this case but upon the Government's experience with other drug operations. To authorize a wiretap on the strength of these generalizations, we insist, would make section 2518(1)(c) a nullity' every alleged drug organization would be susceptible to wiretap without any showing as to the necessity of a wiretap for the investigation of the particular drug organization in question. We find support for our position in United States v. Kalustion, 529 F.2d 585 (9th Cir. 1975). The court found the affidavit is inadequate because of a failure to alleged facts demonstrating why that particular case necessitated a wiretap.

In effect of the affiant's position is that all drug organization are tough to crack, so the affiant need show only the probability that illegal drug activity is afoot to justify electronic surveillance. Title III does not support that view.

In United States V. Rice, 478 F.3d 704 (6th Cir. 2007) the Sixth Circuit affirmed the trial court's granting of a motion to suppress wiretap evidence, where in circumstances similar to those here, the statements in the affidavit were misleading and were made recklessly. Additionally the Sixth Circuit found that the affidavit when reformed for its factual deficiencies, failed to meet the necessity requirement under Title III.

## Conclusion

In conclusion, Hopkins submits that the Government's affidavit offered in support of surveillance of electronic and wire communications and purporting to show that "normal investigative procedures have been tried and have failed" was inadequate and did not meet the requirements of the statute. The explanations of why normal investigative procedures and alternatives were not available were conclusive; and, to the contrary, showed that normal investigatory methods were continually and successfully being implemented with significant results. Accordingly, the government's applications did not contain sufficient facts to satisfy 18 U.S.C. §2518(1)(c) and support the issuing court's § 2518(3)(c) findings. Additionally Hopkins submits that Agent Ervin intentionally misled the approving court and displayed a reckless regard for the truth by omitting certain facts and noting others out of context to enhance the allegations which were essential to finding of probably cause.

## Relief Sought

Based on the foregoing, Defendant Hopkins respectfully request this Honorable Court to enter an Order suppressing the wiretap which was used at trial and all evidence that was obtained directly or indirectly as a result of the unlawful interceptions.

Dated this 9th day of May, 2008

DCDC: 314893
1901 D. Street, S.E.
Washington, D.C.
20003
Troy Hopkins, Pro Se