UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | 06-CR-227-02 (RBW) |
| TROY ANTOINE HOPKINS | : | |

DEFENDANT'S RESPONSE TO GOVERNMENT'S
SUPPLEMENTAL SENTENCING MEMORANDUM (Doc. 365)

Defendant Troy Antoine Hopkins, by and through undersigned counsel, offers the following response to the Government's Supplemental Memorandum In Aid of Sentencing (Doc. #365) filed in response to the Defendant's Response to Presentence Report and Memorandum In Aid of Sentencing (Doc. #359). The defendant will appear before this Honorable Court for sentencing on July 23, 2008. The responses are addressed in the order they appear in the government's Supplemental Memorandum.

Traveling with Couriers

Defendant Hopkins objected to the assertion that he escorted couriers on flights and maintains that assertion. The government's response is to produce one flight record from May 25, 2005, predating the date of the charged conspiracy (September 2005 through July 2006), when he accompanied Lolita Swann from Washington to Long Beach. There is no evidence Lolita Swann carried PCP on that flight or any other, and no PCP was ever seized from Lolita Swann on any flight. On page one the government cites to several passages of testimony by Tinesha Adams, none of which supports the government's assertions. Tinesha Adams testified

that Lolita Swann was a "friend," and Adams never testified Swann was a courier or facilitator for Troy Hopkins, as the government's pleading claims. In fact, the only testimony by Tinesha Adams about Lolita Swann and PCP was that Swann attempted to meet Tony Hilt on her own, through Adams, and set up her own PCP distribution scheme with Tinesha Adams separate and apart from Troy Hopkins. Tr. October 4, 2007, a.m., p 119-120. There is no evidence Hopkins escorted couriers during the time of the charged conspiracy.

### Diluting PCP with Starter Fluid

Troy Chavious specifically testified he did not learn from his uncle Troy Hopkins about the use of starter fluid to dilute PCP. The starter fluid found in Troy Hopkins' father's home was used there by an auto mechanic, according to Chavious. Tr. October 11, 2007, a.m., p 125. He saw Darnell Jackson with starter fluid on Lundy Drive but never saw Jackson dilute PCP with it or buy PCP from Hopkins on the occasion he was carrying starter fluid on Lundy Drive, contrary to the assertion in the government's pleading. The transcript citations to Darnell Jackson's testimony on this point reveal nothing about the use of starter fluid. Any intercepted call of Troy Hopkins referencing the use of starter fluid revealed only that he condemned its use and objected to the practice. Tr. October 22, 2007, a.m., p 38.

### Sales of Cocaine During the PCP Conspiracy

The government is clearly mistaken in asserting that the Defendant concedes having sold cocaine at any time to Darnell Kinard Jackson (or anyone else). This fact is in dispute. In the Defendant's Sentencing Memorandum the following was submitted on page seven regarding that unproven allegation:

> There is only one instance, that recounted, of [Mr. Hopkins] agreeing to assist
> Darnell Jackson's uncle one time in preparing cocaine base, not purchased, sold,
> or retained by Mr. Hopkins.

There is no evidence Mr. Hopkins sold, traded, bartered, possessed, or used cocaine at any time during the charged conspiracy. The presence of small plastic ziplock bags found <u>outside</u> the home is not evidence of cocaine sales any more than it is evidence of marijuana sales or small jewelry sales.

<u>Amount of Drugs Attributable to Hopkins as Relevant Conduct</u>

The estimated amounts of phencyclidine attributable to Mr. Hopkins directly and as relevant conduct are exaggerated by the government and subject to unfounded assumptions, inferential leaps, and calculated from conduct outside the scope of the conspiratorial agreement or not foreseeable to Mr. Hopkins as the result of jointly undertaken criminal activity.

The foundational basis of the government's assumptions are that each courier carried PCP each time they boarded a flight, and that on each flight each courier transported one gallon (3.7 kg) of phencyclidine. While there is some evidentiary basis for the government's calculations with respect to particular incidents, these broad overall assumptions are not supported by the record. Testimonies about the same incident by different witnesses are juxtaposed to appear as separate instances, unjustifiably adding to the drug amount totals. Much of the evidence is derived from unreliable reporters who are contradicted by other evidence in the record, casting substantial doubt on different witness versions of how many trips were taken and how much PCP was transported. Often there appears to be double counting of drug amounts by assuming that the transport of cash back to Los Angeles represents separate additional purchase amounts. These alleged amounts are not accounted for by independent evidence of transport and may well be purchase monies delivered after the fact for drug amounts previously advanced by the supplier.

Dominique Washington testified that she transported PCP the first time with Alfred Adams, Tinesha Adams' brother, but offered no testimony as to the amount she carried or the

3

number of bottles transported by her or Adams. The government's memorandum asserts that three couriers traveled each carrying one-half gallon (5.4 kg). Gov't Memorandum at 5. There is no support in the transcript for this assertion. Dominique Washington offered no testimony about how much she carried on this first trip in October 2005. TR. 10/09/07, p.m., pp. 11-112. Rather, having been paid only $500, her "half," (TR. Oct. 17, 2007p.m., pp. 112, 114), it is reasonable to assume each courier carried less than one-half gallon (Lanika Washington testified that during her trips she carried three 16 ounce bottles. TR. 10/09/07, p.m., pp. 75-76). The calculation of 5.4 kg here is excessive. In early December 2005 Washington traveled again, allegedly with Shantae Anderson, but she testified only that they each carried "two bottles" of undetermined size. TR. Oct. 17, 2007, p.m., pp. 118. No flight records are cited to corroborate this trip. On her third trip, also in December 2005, allegedly made with "Aisha," again no quantity is determined in the record, either by number or size of bottles. Interestingly, Washington was certain she had met Darnell Jackson in California before this trip, but Jackson never testified to having been in California at anytime in 2005 and no flight record evidence corroborates his presence there at that time. The attribution of 10.9 kg in December 2005 is excessive and not supported by the record. One of the alleged gallons (3.7 kg) counted here is due to Washington's testimony that she carried $10,000.00 to Los Angeles when returning after the third trip, during which she spent intimate time with Mr. Jackson. There is no evidence, however, that this money was not payment for the earlier-transported PCP and no evidence of subsequent transportation of an additional gallon.

      Washington's next alleged trip was in March of 2006, when she called Darnell Jackson in an attempt to arrange courier trips without the assistance of Tinesha Adams. Washington made reference to buying 32 ounce shampoo bottles at a beauty supply store, but made no reference to how much PCP, if any, she transported to Washington, D.C. This is supposedly the trip which

resulted in a controlled buy on March 9, 2006, by the FBI involving informant Antoine Richards ("Pops") referenced on page four of the Government's supplemental Memorandum.  Darnell Jackson, however, testified that he did not buy any PCP on that trip to Los Angeles with Antoine Richards because he "wasn't feeling right." TR. Oct. 22, 2007, a.m., p. 13.  He Also insisted that "Dominique was nowhere around there."  Id.  Subsequent testimony by Washington about trips in March (by Shamonique Walker) and April (by herself) make reference to 4 bottles of undetermined size.  All of these 2006 trips by Washington were made in concert with Darnell Jackson only;  Troy Hopkins was not a part of these trips, was not a part of the purchases, and none of them were reasonably foreseeable to Troy Hopkins nor part of any jointly undertaken criminal activity.  Darnell Jackson was operating separately and independently from Hopkins, as both Washington (TR. Oct. 17, 2007, p.m., pp. 8-42) and Jackson testified (TR. Oct. 18, 2007, p.m., p.102).  See Tabron v. United States, 437 F.3d 63 (U.S.App. D.C. 2006).

      Lanika Franklin testified about four trips, of which on three times she transported no more than three 16 ounce bottles.  The first trip was in August 2005 and outside the time frame of the charged conspiracy (September 2005 – July 2006). TR. 10/09/07, p.m., p. 87.  None of the PCP transported outside the time of the charged conspiracy is attributable to Mr. Hopkins as relevant conduct.  The second time she travelled alone and carried three 16 ounce bottles.  TR. 10/10/07, a.m., p. 19.  Contrary to the assertions in the Government's Supplemental Memorandum, Ms. Franklin did not agree on her return to carry cash back to California for Scott Wages or Troy Hopkins.  TR. Oct. 10, 2007, a.m., p. 31.  On the third trip, in May 2006, Franklin testified that she and Tinesha Adams each carried three 16 ounce bottles (TR. Oct. 10, 2007, a.m., p. 42), far less than the 3.7 kg attributed to Mr. Hopkins in the Government's Supplemental memorandum at p. 8.

According to the government Tinesha Adams' first trip transporting PCP was in 2004. That alleged amount (1.81 kg) predates the charged conspiracy and is not attributable to Mr. Hopkins as relevant conduct. Although the government points to $80,000.00 in cash carried back to California by Ms. Adams, there is no foundation to aggregate an additional 8 gallons of alleged PCP where there is no independent evidence that additional PCP was transported outside the trips already documented by the government's witnesses. This amounts to double counting of drug amounts not corroborated by independent evidence of flight records or courier testimony. It is reasonable to assume the money was spent on PCP; it is not reasonable to assume it represents independent additional purchases not already represented in the evidence adduced at trial. For example, at p. 9 the government attributes 2 gallons (7.4 kg) to a single trip made by a courier named Tina, a heavy-set Caucasian woman. Is this the same PCP counted again on p. 17, where Tina is reported to have traveled in late January, 2006 (the only flight record cited for her), or was it the same trip made by Tina for Christopher Dobbins ("Dookie") and Darnell Jackson in approximately February 2006 (Gov't Memo, p. 10; TR. Oct. 30, 2007, pp. 60-68)? It is clear from the transcript citation allegedly regarding Tina (TR. Oct. 4, 2007, a.m. pp. 80-82) that the two gallons at issue were the two seized from Adams and Franklin on May 24, 2007, at Dulles Airport (2 gallons Adams attributed to Darnell Jackson), and already accounted for in the Government's Supplemental Memorandum at p.p. 4-5.

Was the money delivered by Tinesha Adams to Troy Hopkins during that episode, described by Dobbins, really for an additional gallon of PCP or was it used to pay for the PCP obtained from Hilt by Jackson and carried to D.C. by Tina? Without direct evidence of separate purchases or corroborating flight records it is mere speculation that a second gallon was purchased or delivered at that time. Contrary to the government's assertions that Ms. Adams believes she took 15-20 PCP trips, she clearly testified she did not count the flights or keep track,

6

TR. Oct. 4, 2007, a.m., p. 38, and when confronted with flight record evidence of 20 trips she clearly disclaimed that all of the trips were for the purpose of carrying PCP for Mr. Hopkins. TR. Oct. 4, 2007, p.m., pp. 36-37. Several of the trips were made for Lolita Swann, independent of Mr. Hopkins, and clearly unforeseeable to him as Swann and Adams conspired independently to conceal their separate operation from Hopkins. TR. Oct. 4, 2007, p.m., pp. 25-30, 35-36. Also contrary to the government's bald assertion, Christopher Dobbins did not spend $10,000.00 of the $14,000.00 he carried to L.A. for Darnell Jackson on PCP obtained for him by Troy Hopkins (Gov't Memo at p. 10). Dobbins testified clearly that no PCP was obtained on that trip, that Tony Hilt was not able or willing to supply anyone, and that Dobbins returned to D.C. with Jackson's money and gave it back to Jackson. TR. Oct. 30, 2007, p.m., p. 76.

    Flight Records

Flight record evidence is an unreliable indicator of drug quantity amounts transported. Only through unfounded speculation can flight record evidence have meaningful impact on the calculation of drug amounts. It is clear that not all trips resulted in purchases; therefore, not all trips could result in PCP being transported. On pages 10-15 of the Government's Supplemental Memorandum the United States lists some 19 flights, including the 2004 interdiction at Burbank Airport that was introduced as 404(b) evidence of prior acts of uncharged misconduct, that all predate the charged conspiracy and cannot be counted as relevant conduct no matter how much PCP, if any, may have been transported (over counting by at least 18 kg). The remaining 28 flights by various individuals include amounts already attributed to testifying couriers, flights by Hopkins, for whom there is NO evidence he ever carried PCP, flights by Troy Chavious, already counted in the money delivery paragraph on page 5, and flights by Jackson, Dobbins, Roots and Hargrove that do not implicate any of them as carriers of any amounts of PCP.

<u>Gun Use by Hopkins</u>

There was no video evidence at trial depicting Troy Hopkins wielding weapons of any kind. The incident described by Troy Chavious on May 17, 2006, when the FBI surveillance van was observed outside the Lundy Drive residence, indicates that Troy Hopkins was not present. Videographer Jesus Gomes described how individuals approached the van attempting to look inside. None of those persons was Troy Hopkins. When asked if Hopkins was present during the episode, Troy Chavious replied, "I don't remember." TR. Oct. 11, 2007, a.m., p. 73.

When asked how he responded to the perceived threat, Troy Chavious replied, "Once I realized somebody was in the van and they was hiding from me, I called my uncle." TR. Oct. 11, 2007, a.m. p. 75. Chavious claims Hopkins arrived later and armed himself to protect the Lundy Avenue home from possible invasion. There is no video evidence of that having happened. Chavious was uncertain, and said "I think [Hopkins armed himself with] a .9 millimeter." TR. Oct. 30, 2007, p.m., p. 76. Aside from a collection of legal firearms in the home of Alfred Hopkins, this is the only scintilla of evidence that Hopkins ever used a firearm, and it was not during the course of a drug transaction or in furtherance of the conspiracy. There is no evidence any drug business transpired that afternoon. The government asserts firearms inside the home were available to members of the conspiracy. They were available only to Alfred Hopkins. Troy Chavious testified the two guns kept outside in a bush belonged to himself and his grandfather, a former member of the Metropolitan Police Department properly licensed by the State of Maryland to possess firearms. There is no evidence of the guns being used in furtherance of the drug conspiracy or for any reason other than household protection. The security cameras testified about by Troy Chavious were installed by Alfred Hopkins for the protection of his household.

Obstruction of Justice Enhancement

The government is incorrect in maintaining that a 2-point offense level enhancement is applicable because Mr. Hopkins failed to surrender and allegedly engaged in flight despite knowing of the existence of a warrant for his arrest. This is not a circumstance for which this enhancement is applicable. An arrest warrant is not a court order to the defendant to return to court or to submit to the court's jurisdiction. It is an order only to law enforcement agents to effect the apprehension of the wanted defendant. Failing to surrender is not a violation by the defendant of any order. The enhancement specifically does not apply, by terms of the application notes, to a situation where a defendant flees to avoid arrest. Flight is not synonymous with escape from custody, and knowledge of the existence of a warrant imposes no legal duty to surrender for which a "violation" can be sanctioned against a recalcitrant defendant. There should be no adjustment for Obstruction of Justice pursuant to U.S.S.G. §3C1.1. Application note five (5) of that guideline instructs that some conduct ordinarily does not warrant application of this adjustment, including specifically the act of avoiding or fleeing from arrest (*see* Application Note 5(d)). In Application Note 4, a non-exhaustive list of obstructive conduct that ordinarily does warrant the adjustment, there is no mention of the type of behavior alleged here. The two-point adjustment added by ¶28 of the Presentence Investigation should not be calculated in the offense level. The obstruction of justice adjustment is improperly applied here.

9

Respectfully submitted,

/s/
_____
CARY CLENNON
DC Bar # 366816
Counsel for Mr. Hopkins
Appointed by the Court

P.O, Box 29302
Washington, DC 20017
(202) 269-0969

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the preceding pleading was sent by facsimile and electronic mail to S. Elisa Poteat and Emory Cole, Office of the United States Attorney for the District of Columbia, 555 Fourth Street NW, Washington, DC 20530.

/s/
_____
CARY CLENNON